**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 16-20417-Civ-COOKE/TORRES**

PETERBROOKE FRANCHISING OF
AMERICA, LLC,

      Plaintiff/Counter-Defendant,

vs.

MIAMI CHOCOLATES, LLC, et al.,

      Defendants/Counter-Plaintiffs.

_____/

## OMNIBUS ORDER ON MOTIONS FOR SUMMARY JUDGMENT

This is a breach of contract, trademark infringement, and unfair competition action under the Lanham Act, 15 U.S.C. § 1114, and Florida state law. Peterbrooke Franchising of America, LLC ("PFA") alleges that its former franchisee, Miami Chocolates, LLC ("Miami Chocolates") and its owners, Charles and Judy McDonald, breached the parties' franchise agreement by, *inter alia*, operating a competing business using valuable PFA business assets, including registered trademarks. I have jurisdiction under 28 U.S.C. §§ 1331 and 1367.

Pending are PFA's Renewed Motion for Summary Judgment on its Complaint and Defendants' Counterclaim (ECF No. 164), and Defendants' Motion for Summary Judgment (ECF No. 167). For the reasons that follow, I grant the Motions in part and deny them in part.

## BACKGROUND

On August, 24, 2007, Miami Chocolates entered into a Franchise Agreement (the "Franchise Agreement" or "Agreement") with franchisor Peterbrooke Franchising, Inc. ("PFI") for the right to operate a Peterbrooke chocolatier shop in Miami (the "Shop"). (ECF No. 166 ¶ 1). The McDonalds purchased and assumed operation of the Shop in September 2010. (*Id.* ¶ 2).

The Agreement sets forth specifications and procedures for operating the Shop. It provides, *inter alia*, that the owner/operator shall use and record all sales using a computer register or point-of-sale ("POS") system. (ECF No. 1-1 at 14, § 4.6.1). In relevant part, the Franchise Agreement states that:

1

When so instructed by Us, You shall procure and install for the Shop such computerized cash register polling packages, a POS register station, designated accounting software and software options, associated computer hardware, required dedicated telephone and power lines, modem(s) for polling purposes, printer(s), and other related accessories or peripheral equipment, and bar coding equipment as We specify in our manual and otherwise. You shall provide any assistance required by Us to bring such system on-line with Our system at the earliest possible time and You expressly agree that We shall thereafter have the free and unfettered right to retrieve such data and information from Your system as We, in Our sole and exclusive discretion, deem necessary or appropriate. The cost of such retrieval shall be borne by Us. You shall bear the sole cost of the foregoing items to be installed or purchased and activities to be accomplished by You and the delivery and installation cost of all hardware and software.

(*Id.* at 14, § 4.6.2).

Section 4.6.3 further provides, *inter alia*:

You further understand that it may become necessary for You to replace or upgrade the entire cash register system with a larger system capable of assuming and discharging all the tasks and functions specified by Us. You further understand and agree that as designs and functions change periodically, We may be required to make substantial modifications to Our specifications or to require installation of entirely different systems during the term of this Agreement or during the term of any renewal Franchise Agreement.

(*Id.* at 14-15, § 4.6.3).

Section 4.6.4 continues:

You agree, at Your expense, to keep Your cash register system in good maintenance and repair. Following Our testing and determination that it will prove beneficial to You, You agree to install at Your own expense such additions, changes, modifications, substitutions and/or replacements to Your hardware, software, telephone lines, power lines and other related facilities as We direct on those dates and within those times specified by Us in Our sole and exclusive discretion in Our Operating Manual or otherwise.

(*Id.* at 15, § 4.6.4).

Section 18 specifies that failure to comply with any provision is a default:

If you or any of Your Owners fail to comply with any provision of this Agreement or any mandatory specification, standard, or operating procedure prescribed by Us, We may terminate this Agreement effective immediately upon delivery of written notice of termination to You . . . .

2

(*Id.* at 50, § 18.1.1).

Section 19 spells out the parties' post-termination rights and obligations, including Miami Chocolates' obligation to stop using Peterbrooke trademarks:

> 19.2.1 Upon the termination or expiration of this Agreement, You shall:
>
> (a) not thereafter, directly or indirectly, at any time or in any manner identify Yourself or any business as a current or former Peterbrooke Chocolatier Shop or as a current or former franchisee of or as otherwise associated with Us, or use any Mark, any colorable imitation thereof or any mark substantially identical to or deceptively similar to any Mark in any manner or for any purpose, or utilize for any purpose any trade name, trademark or service mark, Domain Name, or other commercial symbol or trade dress that suggests or indicates a connection or association with Us;
>
> (b) remove all signs containing any Mark and return to Us or destroy forms and materials containing any Mark or otherwise identifying or relating to an Peterbrooke Chocolatier Shop;
>
> \*      \*      \*
>
> 19.2.2 You shall furnish to Us (a) within thirty (30) days after the effective date of termination or expiration, evidence satisfactory to Us of Your compliance with Subparagraphs (a) and (c) of the foregoing obligations, and (b) within thirty (30) days after the later of expiration of Our option to purchase the Shop as provided in Section 19.6 or receipt of notice that We elect not to purchase the Shop pursuant to Section 19.6, evidence satisfactory to Us of Your compliance with the foregoing obligations.[1]

(*Id.* at 52-53, §§ 19.2.1-19.2.2).

Section 19 also includes a non-compete provision:

> 19.4.1 Upon termination of this Agreement by Us in accordance with its terms and conditions, or by You without good cause . . . neither You nor any of Your Principal Owners shall directly or indirectly,

---

[1] Section 19.6 provides, in relevant part:

> Upon termination of this Agreement by Us in accordance with its terms and conditions, upon termination of this Agreement by You without cause, or upon expiration of the Agreement without the grant of a Renewal Franchise, We shall have the option to purchase from You all the assets used in the Shop. We may exercise this option by giving written notice thereof within sixty (60) days from the date of such expiration or termination.

(ECF No. 1-1 at 54-55, § 19.6).

> through a member of the immediate family of You or a Principal
> Owner or otherwise for a period of two (2) years commencing on the
> effective date of such termination or expiration or the date on which
> You cease to operate the Shop, whichever is later: (a) have any interest
> as a disclosed or beneficial owner in any Competitive Business located
> or operating within a twenty five (25) mile radius of the Shop or any
> other Peterbrooke Chocolatier Shop . . . .[2]

(*Id.* at 53-54, § 19.4.1).

Finally, the Agreement requires Miami Chocolates to de-identify the Shop as a former Peterbrooke franchise upon termination or expiration, specifically requiring that it:

> [M]ake such modifications and alterations, including removal of all
> distinctive physical and structural features associated with the Trade
> Dress of Peterbrooke Chocolatier Shops, as may be necessary to
> distinguish the Site of the Shop so clearly from its former appearance
> and from other Peterbrooke Chocolatier Shops as to prevent any
> possibility that the public will associate the Site with Peterbrooke
> Chocolatier Shops and any confusion created by such association.

(*Id.* at 53, § 19.2.1(g)).

PFA purchased PFI's rights and responsibilities under the Franchise Agreement in January 2012. (ECF No. 63 ¶ 14). Under a separate agreement with Peterbrooke Idea Company, LLC, PFA also possesses the right to use Peterbrooke trademarks worldwide to operate chocolate stores and to grant franchises and licenses to third parties to do the same. (ECF No. 63 ¶ 10), and to pursue legal action against third parties, including former franchisees, for infringement and unfair competition. (*Id.*).

When the McDonalds purchased Miami Chocolates, Peterbrooke stores used an Iciniti Corp POS. (ECF No. 166 ¶ 6). According to Defendants, initial discussions about transitioning away from the Iciniti Corp POS began in 2012. (*Id.* ¶ 7). In November 2013, PFA sent Miami Chocolates a notice requiring it to change over to a Micros Simphony System (the "Micros System"). (*Id.* ¶ 8). Miami Chocolates refused, asserting that the Micros System was not appropriate for a chocolatier shop and did not meet Peterbrooke specifications. (*Id.* ¶ 10).

On October 14, 2015, PFA sent Miami Chocolates another notice requiring it to change its POS system, this time to the NCR Silver POS System with Simplebox software

---

[2] The Franchise Agreement defines a "Competitive Business" as a retail food service business other than a Peterbrooke Chocolatier shop that features frozen desserts and gourmet chocolate products for sale as primary items. (ECF No. 1-1 at 17, § 2.1.2).

(the "New POS System"). (*Id.* ¶ 21; ECF No. 163 ¶ 10). Miami Chocolates refused for the same reasons it refused to install the Micros System. (ECF Nos. 163 ¶ 22, 166 ¶¶ 30-31). On December 2, 2015, PFA sent Miami Chocolates a Notice of Default. (ECF No. 163 ¶ 24). Miami Chocolates responded by confirming its refusal to change over to the New POS System (*Id.* ¶ 25), prompting PFA to send the Notice of Termination on January 28, 2015. (ECF Nos. 20, 163 ¶ 12).

Miami Chocolates continued operating following the termination (ECF No. 163 ¶ 16-17), but Defendants claim they took several steps to disassociate it from PFA and its trademarks.[3] (ECF No. (ECF No. 166 ¶¶ 48-49). PFA disagrees:

> It was not until PFA filed for emergency preliminary injunctive relief in this Court . . . that Defendants made any effort to cease operating as a Peterbrooke shop. But even those efforts were woefully inadequate and ineffective. Defendants took half-hearted measures (e.g., sloppily spray painting over the word "Peterbrooke" on the distinctively shaped and colored outdoor Peterbrooke Chocolatier sign, placing a garbage bag over another prominent exterior sign) that actually harmed PFA, making the premium Peterbrooke Chocolatier brand look déclassé and unreliable. . . .
>
> Even after removing the word "Peterbrooke" from the premises, Defendants continue to still use PFA's trade dress, phone numbers, social media pages, and operate at the location in violation of the Franchise Agreement's valid non-compete provision.

(ECF No. 163 ¶¶ 18-20).

PFA filed this lawsuit on February 4, 2016. (ECF No. 1). The five-count Amended Complaint alleges: (1) Lanham Act infringement (Count I); (2) Lanham Act false designations (Count II); (3) common-law trademark infringement (Count III); (4) common-law unfair competition (Count IV); and (5) breach of the Franchise Agreement (Count V). (ECF No. 63).[4] The trademark infringement claims (Counts I, II, and III) and the unfair competition claim (Count IV) are against all Defendants. The breach of contract claim

---

[3] Defendants claim those efforts included posting a public notice on the Shop's front door advising the public that Miami Chocolates is no longer a Peterbrooke franchise, removing all visible Peterbrooke logos from the interior of the store, replacing two exterior signs bearing the Peterbrooke logo, and re-packaging and re-labeling all of the products. (ECF No. 166 ¶¶ 48-49).

[4] PFA also moved for a preliminary injunction, which I granted in part and denied in part. (ECF No. 78).

(Count V) is against Miami Chocolates alone.

On February 25, 2016, Defendants asserted five counterclaims: (1) breach of contract (Count I); (2) breach of the implied covenant of good faith and fair dealing (Count II); (3) violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.203(3) ("FDUTPA") (Count III); and (4) two requests for declaratory relief (Counts IV, V). (ECF No. 6). I granted PFA's motion to dismiss Counts IV and V on August 1, 2016. (ECF No. 73).

PFA and Defendants filed the instant motions for summary judgment on June 29, 2018 (ECF No. 164) and July 1, 2018 (ECF No. 167), respectively. Both sides seek dismissal of the other side's claims. PFA also asks for summary judgment on its own claims. Defendants do the same, but only as to Count I, their breach of contract claim.

## STANDARD OF REVIEW

Summary judgment "shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997) (quoting Fed. R. Civ. P. 56(c)) (internal quotations omitted); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). Thus, the entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id.*

Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted).

"A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Damon*, 196 F.3d at 1358. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Abbes v. Embraer Servs., Inc.*, 195 F. App'x 898, 899-900 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

When deciding whether summary judgment is appropriate, "the evidence, and all inferences drawn from the facts, must be viewed in the light most favorable to the non-moving party." *Bush v. Houston County Commission*, 414 F. App'x 264, 266 (11th Cir. 2011).

## DISCUSSION

As noted, the parties move for summary judgment on their own claims and also on each other's claims. (ECF Nos. 164 at 3-15, 167). I discuss PFA's claims first.

## I. PFA's Claims

Defendants attack PFA's claims on four grounds: (1) PFA's termination of the Franchise Agreement was invalid; (2) the Agreement's non-compete provision is unenforceable; (3) PFA's trademark infringement and unfair competition claims are meritless; and (4) PFA is not entitled to liquidated damages.

### A. PFA's Termination of the Franchise Agreement

PFA claims that it was entitled to terminate the Franchise Agreement because Miami Chocolates breached it by refusing to install the New POS System. Defendants dispute that assertion on several grounds, arguing, *inter alia*: (1) PFA did not adequately test the POS system before rolling it out; (2) the New POS System did not meet industry standards and was inferior to the POS system Miami Chocolates already was using; and (3) even if Miami Chocolates did breach the Agreement, the breach was not material.

*1. Testing of the New POS System*

The Agreement required Miami Chocolates to install the New POS System after PFA's "testing and determination that it will prove beneficial to" Miami Chocolates. (ECF No. 1 Ex. A at 25, § 4.64). Defendants contend the record is "devoid" of *any* evidence that PFA conducted the required testing and analysis. (ECF No. 167 at 3). To the contrary, Jeff Smith, PFA's CEO, testified:

> When PFA was considering the decision to implement the NCR and
> Simplebox POS System, we did extensive testing to evaluate whether

> this system would benefit the franchise as a whole, as well as individual franchised shops. We first implemented the NCR and Simplebox system in two kiosk locations for approximately six months, and the results were extremely positive. As a result, we implemented the new system in two company-owned Peterbrooke Chocolatier Shops, which also had positive results. It was only after implementing the NCR and Simplebox system in every corporate-owned Peterbrooke Chocolatier Shop, all with positive results, that we made the decision to require franchised shops to implement the new system.

(ECF No. 8-1 ¶ 12).

Smith gave similar testimony at the April 20, 2016 preliminary injunction hearing. (ECF No. 136-6 at 30 ("We continued the testing phase. We went and installed it in corporate locations first, got any additional bugs worked out that may have been in there, and reduced the price. We went to Micros and got a cost reduction."), 33-34 ("Q. As you began testing NCR Silver, what did you learn about it in terms of its comparison to the prior Micros system that was being used?" "A. It was more efficient, gathered more data. It gave us the ability to do more inventory control. It allowed to us track employee as well as device sales. It just gave us a whole lot of technology ability, and the speed of the transaction was much faster as well."), 37-38 ("We tested in one corporate store and . . . . [h]aving completed that test . . . rolled it into corporate locations across the course of the next four to five months.")).

Defendants point to nothing in the record that contradicts Smith's testimony. To the extent they argue that PFA's testing regime was inadequate, PFA correctly points out that "[t]here is no language in the Franchise Agreement that sets out some kind of gauntlet of testing and analysis that PFA must carry out until a franchisee is satisfied before it can institute a POS change." (ECF No. 183 at 4). Thus, the record establishes that PFA tested the New POS System in good faith before requiring Miami Chocolates to install it.

### 2. Quality of the New POS System

Defendants also argue that the New POS System did not comport with what they claim are new "industry standards" requiring a "chip reader" to protect against credit card fraud. (ECF No. 166 ¶ 30). They assert that Miami Chocolates' old POS system was superior to the New POS System because it had a "chip reader," and that PFA ignored this issue because the franchisees, not PFA, bore the risk of credit card fraud. Defendants quote two excerpts from Smith's testimony to support their position:

The whole [credit card] technology industry caught us off guard for the October 1, 2015 [deadline] for the chip readers. Like I said earlier, it is not a mandatory program. All it does is shift liability from the banks to the retailers . . . .

[The credit card "chip reader" innovation] is purely a financial matter by the banks. We used to write checks. When the bank got a returned check, they [re]turned it to the retailer, and they took money back out of the retailer's account so the bank had no exposure. As we went to debit cards and credit cards, the exposure shifted to the banks. This is just the banks shifting the responsibility back to the retailers like they used to do with checks. It's all about the money with the bank.

(ECF No. 136-6 at 61).

According to Defendants, Smith's "cavalier attitude" toward "chip readers" is evidence that PFA terminated the Agreement in bad faith. (ECF No. 167 at 6). But Smith's testimony does not show he acted in bad faith; it shows he is skeptical about the importance of "chip readers" to a retailer's business. Defendants may disagree with Smith's opinion, but mere disagreement does not mean PFA acted in bad faith. *See King v. GNC Franchising, Inc.*, 2006 WL 3019551, at *4 (D.N.J. 2006) (franchisees' disagreement with franchisor's standards and requirements did not render them unreasonable or unenforceable).

Moreover, nothing in the Franchise Agreement even requires PFA to choose a POS system that meets "industry standards," whatever those might be. Indeed, the Agreement's clear language allows PFA broad discretion to require a new POS system *of its choosing*:

- "When so instructed by US, You shall procure and install [POS equipment] *as We specify in our manual or otherwise*." (ECF No. 1-1 at 14, § 4.6.2) (emphasis added).

- "You shall provide any assistance required by Us to bring such system on-line with Our system at the earliest possible time and You expressly agree that We shall thereafter have the free and unfettered right to retrieve such data and information from Your system *as We, in Our sole and exclusive discretion, deem necessary or appropriate*." (*Id.*) (emphasis added).

- "You further understand that it may become necessary for You to replace or upgrade the entire cash register system with a larger system capable of assuming and discharging all the tasks and functions *specified by Us*." (*Id.* at 14-15, § 4.6.3) (emphasis added).

- "Following Our testing and determination that it will prove beneficial to You, You agree to install at Your own expense such additions, changes, modifications, substitutions and/or replacements to Your hardware, software, telephone lines, power

lines and other related facilities *as We direct* on those dates and within those times *specified by Us in Our sole and exclusive discretion in Our Operating Manual or otherwise.* (*Id.* at 15, § 4.6.4) (emphasis added).

Defendants complain that "PFA has never shown Miami Chocolates any evidence that the [New POS System] was properly tested and has never told Miami Chocolates why that system, as opposed to the [old POS] system, is beneficial to Miami Chocolates' business or customers or consistent with PFA specifications." (ECF No. 176 at 5). Again, however, nothing in the Agreement required PFA to share the details of its testing, analysis, and selection process with Miami Chocolates. The decision belonged to PFA, and to PFA alone. Defendants' complaints regarding the alleged inadequacy of the New POS System are therefore unavailing.

### 3. Materiality of the Alleged Breach

Defendants contend that even if they did breach the Franchise Agreement by refusing to install the New POS System, the breach was not material. *See MDS (Canada) Inc. v. Rad Source Tech., Inc.*, 720 F.3d 833, 849 (11th Cir. 2013) ("To constitute a vital or material breach, a party's nonperformance must go to the essence of the contract. A party's failure to perform some minor part of his contractual duty cannot be classified as a material or vital breach." (internal quotation marks omitted)). They cite *Burger King Corp. v. Cabrera*, 2010 WL 5834869 (S.D. Fla. 2010) (order re. motion for preliminary injunction), as support for their position.

In *Cabrera*, defendant franchisee entered into a franchise agreement with Burger King (referred to in the opinion as "BKC"). *Id.* at *1. Burger King later introduced a new POS policy requiring franchisees to replace their POS system when it became "obsolete." *Id.* at *2. The franchisee failed to replace the POS system when required, so Burger King terminated the franchisee agreement and sued the franchisee for trademark infringement and breach of contract. *Id.* at *2-3. The franchisee argued, as Defendants do here, that "he [was] not using the marks without consent because BKC improperly terminated the Franchise Agreements." *Id.* at *4-5. The court concluded that there was a "substantial factual question" as to whether the POS systems that were installed at the franchisee's restaurants were "obsolete" at the time Burger King issued the new POS policy:

> [I]t is not this Court's task to question BKC's business judgment whether the data and operational improvements offered by the New

> POS System is substantially the same or better than the old system, BKC's permissive business decisions must be within the parameters outlined in the Franchise Agreements. Clearly, the new POS system makes is easier for the BKC to monitor royalty payments and to audit sales. However, whether this ability makes the older POS system "obsolete" is a much closer and debatable question that should be resolved on the full record and at trial if necessary. In today's rapid growing world of technology new creative inventions are uncovered on nearly daily basis. Each new invention, although it may be a clear improvement over the older version of the same product, does not necessarily make the older product "obsolete."

*Id.* at *6.

Based on that holding, Defendants argue "a franchisee's failure to install a New POS System when its POS system is adequate cannot constitute a material breach justifying termination." (ECF No. 176 at 7).

PFA counters that unlike the Franchise Agreement here, the *Cabrera* agreement "explicitly stated that [Burger King] could only demand that franchisees replace a POS system under certain circumstances. . . . The plain and unambiguous language of the *Cabrera* Agreement set forth conditions precedent that needed to transpire before [Burger King] could require franchisees to replace a POS system: (1) when it was obsolete or inoperable; (2) due to a change in menu; (3) due to a change in method of preparation and service of product, or (4) for health and safety considerations." (ECF No. 123 at 2). The court was not convinced that defendant's failure to make changes to its POS system rendered the system "obsolete," at least not at the preliminary injunction stage. *Id.* at *6. The court clarified, however, that its ruling

> does not mean . . . that [Burger King] will not ultimately prevail on this issue, either on summary judgment or at trial. *If the Court or trier of fact determines that [Burger King's] policy to update the POS systems on this timetable rendered the existing equipment obsolete [thus meeting one of the franchise agreement's conditions precedent, Burger King] will then be able to shut down Defendants' operations.* The question here is a more limited one: can [the court] make that determination before a plenary review of the case on a preliminary injunction motion. [The court is] much less certain of that.

*Id.* at *7 (emphasis added).

Thus, *Cabrera* does not stand for the proposition Defendants claim. Moreover, unlike the agreement in *Cabrera*, the Franchise Agreement imposes no conditions precedent on PFA's right to require installation of a new POS system, assuming that it first tests the

system and determines it would benefit Miami Chocolates. *Cabrera*, then, is inapplicable, and Defendants' reliance on it to argue that their alleged breach was not material is misplaced.

In sum, Defendants' arguments challenging the validity of PFA's termination of the Franchise Agreement are unpersuasive. The termination was valid because Miami Chocolates breached the Agreement by refusing to install the New POS System. No questions of material fact preclude summary judgment on that issue.

### B. Breach of the Non-Compete Provision

The Franchise Agreement contains a restrictive covenant that prohibits a former franchisee from operating a competing business within twenty-five miles of its former location or other franchise locations for two years (the "Non-Compete Provision"). (ECF No. 1-1 § 19.4). Defendants allege "PFA lacks any evidence demonstrating that it has a legitimate business interest in protecting the goodwill associated with its trademark and the franchise system as a whole." (ECF No. 167 at 16). Thus, they argue, the Non-Compete Provision is unenforceable.

Under Florida law, restrictive covenants not to compete arising from franchise agreements are enforceable as long as they are reasonably limited in terms of time, area, and line of business. Fla. Stat. § 542.335(1). A party seeking to enforce a restrictive covenant must plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant and that the restriction is reasonably necessary to protect those legitimate business interests. Fla. Stat. § 542.335(1)(b) and (c). Legitimate business interests include trade secrets, as defined in Fla. Stat. § 668.002(4); valuable confidential business or professional information that otherwise does not qualify as trade secrets; substantial relationships with specific prospective or existing customers or clients; customer or client goodwill associated with a specific geographic location or specific marketing or trade area; and extraordinary or specialized training. Fla. Stat. § 542.335(1)(b).

If the party seeking enforcement of the restrictive covenant establishes a prima facie case, the party opposing enforcement then has the burden of establishing that the contractual restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the established legitimate business interests. Fla. Stat. § 542.335(1)(c). Florida law requires courts to construe restrictive covenants in favor of providing reasonable protection to all legitimate business interests established by the party seeking enforcement. Fla. Stat. §

542.335(1)(h). It also prevents courts from employing any rule of contract construction requiring the court to construe a restrictive covenant narrowly, against the restraint, or against the drafter where legitimate business interests have been established. *Id.*

Here, Defendants do not dispute that the Non-Compete Provision is reasonable as to time, geographic limitation, and line of business.[5] Rather, Defendants' claim PFA has failed to prove a legitimate business interest justifying the Non-Compete Provision. They point to the fact that the magistrate judge declined to enforce the Non-Compete Provision at the preliminary injunction stage. But "[t]he standard for granting a Motion for Preliminary Injunction is entirely different ('substantial likelihood of success on the merits') than the standard for granting summary judgment (a lack of any 'genuine issue of material fact')." *Noramco Shipping Corp. v. Bunkers Int'l Corp.*, 2003 WL 22594419, at *10 n.10 (M.D. Fla. 2003). A preliminary ruling on a partial record is therefore not dispositive as to any factual issue.

For its part, PFA contends its legitimate business interests include protecting the goodwill associated with Peterbrooke in the geographic region and protecting the ability to sell new franchises. Florida courts have held that covenants not to compete are reasonably necessary to protect a franchisor's legitimate business interest in re-entering the market formerly serviced by a terminated franchise. *See R.J. Gators Franchise Sys., Inc. v. MBC Restaurants, Inc.*, 2005 WL 4655379, at 5 (M.D. Fla. 2005) (plaintiff would be effectively unable to re-enter the market formerly serviced by defendant's franchise absent enforcement of a restrictive covenant). That being the case, PFA's interest in re-entering the market and its efforts to bolster the goodwill associated with Peterbrooke in the Miami area (ECF Nos. 70-1, 70-2) are sufficient to establish its legitimate business interest in enforcing the Non-Compete Provision.

In addition to establishing the enforceability of the Non-Compete Provision, PFA also has established Miami Chocolates' breach of that provision. First, Defendants do not seriously dispute that the Franchise Agreement between PFI and Miami Chocolates is valid.

---

[5] Florida courts have found restrictive covenants more burdensome than the Non-Compete Provision to be reasonable. *See Graphic Business Systems, Inc. v. Rogge*, 418 So. 2d 1084, 1087 (Fla. Ct. App. 1982) (covenant not to compete for two years after termination of employment within 75 miles of the city was reasonable in both time and area); *see also Tomasello, Inc. v. De Los Santos*, 394 So. 2d 1069, 1072 (Fla. Ct. App. 1981) (agreement not to compete for two years following termination facially reasonable).

Second, it is undisputed that Miami Chocolates operated a competing business at the former franchise location after termination of the Agreement. Finally, PFA has shown that it has suffered, at a minimum, monetary damages resulting from Miami Chocolates' violation of the Non-Compete Provision.[6] Accordingly, PFA is entitled to summary judgment on its breach of contract claim seeking to enforce the Non-Compete Provision.

## C. PFA's Trademark and Unfair Competition Claims

Defendants assert that upon receiving PFA's termination notice, Miami Chocolates stopped using Peterbrooke trademarks within the time required under the Franchise Agreement. Accordingly, they contend that PFA's trademark infringement and unfair competition claims are meritless.

"[T]he analysis of the Florida statutory and common law claims of trademark infringement . . . is the same as under the federal trademark infringement claim." *Custom Mfg. and Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 652-53 (11th Cir. 2007 (quoting *Investacorp, Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1521 (11th Cir. 1991)). Under the Lanham Act, 15 U.S.C. § 1114(1), a defendant is liable for infringement, if, without consent, he uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" which "is likely to cause confusion, or to cause mistake, or to deceive." Thus, to prevail, a plaintiff must demonstrate that the defendant's mark is likely to cause consumer confusion. *See, e.g.*, *Frehling Enters., Inc. v. Inter Select Group, Inc.* 192 F.3d 1330, 1335 (11th Cir. 1999). Although likelihood of confusion is generally a question of fact, a court may resolve the issue on summary judgment where the undisputed record evidence would lead a reasonable juror to only one conclusion. *Tana v. Dantanna's*, 611 F.3d 767, 775 n.7 (11th Cir. 2010).

In *McDonald's Corp. v. Robertson*, 147 F.3d 1301 (11th Cir. 1998), the Eleventh Circuit held a terminated franchisee's continued operations creates "a certainty of confusion" among consumers that the terminated franchisee's products actually are the certified products of the franchisor. *Id.* at 1309. Thus, it is well settled that when a terminated

---

[6] The record shows that PFA's business suffered injury that is typical in restrictive covenant cases. Confused customers visited the Shop after termination still believing that it was an authorized Peterbrooke outlet. (ECF Nos. 70-1 ¶¶ 5-6, 70-2). And other franchisees are now refusing to install the New POS System, undermining PFA's franchise system. (ECF No. 70-1 ¶¶ 8).

franchisee continues to use the former franchisor's trademarks without authorization, that conduct, by its very nature, confuses consumers and constitutes trademark infringement. *See, e.g.*, *Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1001 (S.D. Fla. 1992).

Section 19.2.1 of the Franchise Agreement required, *inter alia*, Miami Chocolates to stop using Peterbrooke trademarks, and to remove all signs containing Peterbrooke trademarks, "[u]pon the termination or expiration of [the] Agreement." Under Section 19.2.2, Miami Chocolates was to provide PFA with evidence of its compliance within thirty days of termination, except with respect signage. For signage, Miami Chocolates was to provide PFA with evidence of its compliance within thirty days "after the later of expiration of Our option to purchase the Shop as provided in Section 19.6 or receipt of notice that We elect not to purchase the Shop pursuant to Section 19.6."[7] (ECF No. 1 Ex. A §§ 19.2.2, 19.6).

PFA asks that I interpret Sections 19.2.1 and 19.2.2 to require that Miami Chocolates: (1) stop using *all* Peterbrooke trademarks, including those on signage, *immediately* upon termination;[8] (2) provide evidence to PFA that it complied, except with respect to signage, within thirty days; and (3) provide evidence to PFA that it complied with respect to signage within thirty days after the expiration of the sixty-day purchase option (i.e., within ninety days of termination). Under that interpretation, Miami Chocolates could, at its discretion, keep PFA in suspense about whether it was still using Peterbrooke trademarks on its signs for up to three months after termination. Given the extensive harm PFA claims to have suffered from Miami Chocolates' continued operation after termination, it makes no sense that PFA would agree to such a term. Indeed, if the Agreement required Miami Chocolates to stop using Peterbrooke trademarks immediately upon termination, it makes no sense that PFA would even want two separate notification deadlines.

On the other hand, under Defendants' interpretation of Section 19, Section 19.2.1 imposes a general obligation on Miami Chocolates to stop using Peterbrooke trademarks upon termination or expiration of the Agreement, and Section 19.2.2 establishes a timetable

---

[7] PFA never served a notice of intent not to exercise its purchase option. (ECF No. 167 at 17).

[8] In that case, Miami Chocolates presumably would have had just one day to rid the entire Store of Peterbrooke trademarks, both inside and outside.

for Miami Chocolates to comply and notify PFA. *See World of Beer Franchising, Inc. v. MWB Dev. I, LLC*, 2017 WL 4618565, at *5 (11th Cir. 2017) ("Our interpretation of the franchise agreements must give effect . . . to all provisions of the agreement[s] if it can be reasonably done." (internal quotation marks omitted)). In that scenario, the Agreement permitted Miami Chocolates to leave outdoor signs in place until PFA decided whether it was going to purchase the Shop. That would explain why PFA agreed to two separate deadlines in Section 19.2.2, and why one of them is two months longer than the other. I therefore adopt Defendants' interpretation. *See, e.g.*, *In re Finevest Foods, Inc.*, 159 B.R. 972, 978 (M.D. Fla. 1993) ("[I]f one interpretation would lead to an absurd conclusion then that interpretation should be abandoned and one adopted that accords with a reasonable, logical and rational interpretation.") (citing *Triple E. Dev. Co. v. Floridagold Citrus Corp.*, 51 So. 2d 435 (Fla. 1951)); *Hunt v. First Nat'l Bank of Tampa*, 381 So. 2d 1194, 97 (Fla. Ct. App. 1980) ("When a contract is subject to two interpretations, a court is required to give preference to a reasonable interpretation of a contract over an unreasonable interpretation.").

Accordingly, as there is no dispute that Miami Chocolates continued to use Peterbrooke trademarks both inside the Store and on outdoor signage for some period of time after termination (ECF No. 163 ¶¶ 15-18; 166 ¶ 50), the question is whether that use extended beyond the thirty- and sixty-day timetables set forth in Section 19.2.2. Defendants insist that it did not (ECF No. 166 ¶¶ 47-50), and there is no evidence showing otherwise. Accordingly, PFA cannot prove its trademark infringement claims.

PFA also alleges that Defendants misappropriated other valuable PFA business assets, including PFA's phone numbers, social media pages, and the Shop location. (ECF Nos. 70-1, 70-2, 163 ¶ 20). Defendants do not appear to dispute that assertion. PFA therefore argues that Defendants violated state and federal unfair competition law.[9]

Section 1125(a) of the Lanham Act provides, in relevant part:

> i.  Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –

---

[9] "[T]he legal standards we apply to [the FDUPTA] claim are the same as those we have applied under section 43(a) of the Lanham Act." *Crystal Entm't & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1323 (11th Cir. 2011).

1. is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person...

. . . shall be liable in a civil action by any person who believes that he or she likely to be damaged by such act.

15 U.S.C. § 1125(a).

In other words, "any activity that would create a likelihood of confusion or misunderstanding as to the source or sponsorship of a Defendants' businesses, goods, or services, or as to Defendants' affiliation, connection or association with PFA and its franchisees or any of their goods and services" (ECF No. 164 at 5-6) constitutes unfair competition. *See 7-Eleven, Inc. v. Kapoor Bros., Inc.*, 977 F. Supp. 2d 1211, 1231 (M.D. Fla. 2013). Thus, to prevail, PFA must show (1) Defendants used a term, name, symbol, or device in commerce; (2) in connection with goods, services, or container for goods; (3) which is likely to cause confusion, or mistake, or to deceive the public; (4) as to the affiliation, connection or association of Defendants and PFA. *See, e.g., Dunkin' Donuts Inc. v. Donuts, Inc.*, 2000 WL 1808517, at *4 (N.D. Ill. 2000). Defendants' continued use of PFA's phone numbers, social media pages, and the Shop location after termination of the Franchise Agreement more than satisfies that standard.

## D. <u>Damages</u>

PFA seeks three categories damages: (1) statutory damages totaling $600,000.00 for trademark infringement under 15 U.S.C. § 1117(c); (2) disgorgement of profits for unfair competition under 15 U.S.C. § 1125(a); and (3) liquidated damages for breach of the Non-Compete Provision totaling $60,795.00 (Miami Chocolates' average monthly revenue, $856.28, multiplied by seventy-one months, the amount of time remaining on the Franchise Agreement at the time of termination).

PFA's first argument is moot because, as explained above, PFA cannot prove trademark infringement. Even if it could, its damages argument fails. PFA seeks statutory damages under § 1117(c). (ECF No. 164 at 12-13). PFA contends that it may elect an award of $1,000 to $200,000 for each of the three "counterfeit marks" Defendants allegedly used post-termination. Defendants counter that "a holdover franchisee's use of the franchisor's original trademark post-termination may constitute unauthorized use, but it is not

counterfeiting." *See, e.g.*, *U.S. Structures. Inc. v. J.P. Structures. Inc.*, 130 F.3d 1185, 1192 (6th Cir. 1997); *G6 Hospitality Franchising LLC v. Hi Hotel Group, LLC*, 2016 WL 1109216, *4 (M.D. Pa. 2016); *Motor City Bagels, L.L.C. v. Am. Bagel Co.*, 50 F. Supp. 2d 460, 489 (D. Md. 1999). The cases Defendants cite in support of their position so hold, and PFA points to no cases holding otherwise.

With respect to damages for unfair competition, I agree with PFA that it is entitled to recover Defendants' profits, any damages it sustained, and the costs of the action.[10] *See* 15 U.S.C. § 1117(a). If, however, Miami Chocolates operated at a loss during the period it competed unfairly, the royalties PFA normally received and the expenditures necessary to establish a new franchise will be elements of the damages award. *See Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1566-67 (11th Cir. 1986).

Finally, regarding liquidated damages, Defendants point out that an Addendum to the Franchise Agreement limits liquidated damages to twelve months of average revenues. (ECF No.1-1 at 78). Specifically, the Addendum modifies Section 19.7 of the Agreement as follows:

> [L]iquidated damages equal to the present value . . . of the Royalty Fees You would have paid on the product of (a) the Shop's average monthly Gross Revenue during the twelve (12) months of operation preceding the effective date of termination multiplied by (b) ~~the number of months remaining in the Agreement had it not been terminated by Us or You."~~ twelve months.

PFA makes no attempt to argue that the Addendum does not apply. Indeed, it is well settled that when liquidated damages provisions "are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract," they are enforceable. *Priebe & Sons v. United States*, 332 U.S. 407, 412 (1947). Accordingly, by the Court's calculation, PFA is entitled to $10,275.36 for breach of the Non-Compete Provision under the post-Addendum liquidated damages provision.

## II. Defendants' Counterclaims

Defendants' three remaining counterclaims are: (1) breach of contract (Count I); (2) breach of the implied covenant of good faith and fair dealing (Count II); (3) violation of FDUTPA (Count III). (ECF No. 6 ¶¶ 55-85). PFA moves for summary judgment on all

---

[10] I do not agree that this case is so "exceptional" that an award of attorneys' fees is justified. *See* 15 U.S.C. § 1117(a).

Counts, while Defendants seek summary judgment only as to Count I.

## A. Breach of Contract

In Count I, Defendants assert that Peterbrooke "has breached the Agreement by not providing Miami Chocolates with the high-quality products contemplated by the Agreement." (*Id.* ¶ 60). Defendants generally complain about the quality of a few product shipments Miami Chocolates received, but fail to present evidence identifying particular shipments they claim were substandard. Nor do they offer any evidence of harm.

Defendants further assert that PFA has not provided a host of services delineated in Paragraph 64 of the Counterclaim, including not "regularly updat[ing] the recipe book" or "operations manual" and not establishing a "Public Relations Strategy." But none of the alleged obligations listed in Paragraph 64 even exist in the Franchise Agreement. Section 5.2.1 states that PFA *may* provide additional training. (ECF No. 1-1 at 10-11, § 5.2.1). Section 5.4 states that the operations manual *may* be modified from time to time. (*Id.* at 11, § 5.4). And although Section 5.3 provides that PFA will provide special training if requested by Miami Chocolates (*Id.* at 11, §5.3), there is no evidence that Miami Chocolates ever made such a request.

In short, Defendants have not established that PFA breached the Franchise Agreement.

## B. Breach of Good Faith and Fair Dealing

It is well settled that there can be no breach of the implied covenant of good faith and fair dealing absent a breach of contract. *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1316 (11th Cir. 1999). As PFA did not breach the Franchise Agreement, Count II of Defendants' Counterclaim fails.

## C. FDUTPA Violation

A FDUTPA claim has three elements: "(i) a deceptive act or unfair practice; (ii) causation; and (iii) actual damages." *City First Mort. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2008). Under FDUTPA, an act is deceptive if there is a "'representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'" *Sundance Apartments I, Inc. v. Gen. Elec. Capital Corp.*, 581 F. Supp. 2d 1215, 1220 (S.D. Fla. 2008) (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)). Here, there is no evidence of any "deceptive act or unfair practice" by PFA, or of any "actual damages" to a consumer from such an act or

practice. Defendants FDUTPA claim is therefore meritless.

## CONCLUSION

In light of the foregoing, it is hereby **ORDERED and ADJUDGED** as follows:

1. PFA's Renewed Motion for Summary Judgment on its Amended Complaint (ECF No. 164) is **DENIED** as to Counts I through III, and is **GRANTED** as to Counts IV and V.

2. PFA's Renewed Motion for Summary Judgment on Defendants' Counterclaims (ECF No. 164) is **GRANTED**.

3. Defendants' Motion for Summary Judgment (ECF No. 167) is **GRANTED** as to Counts I through III of the Amended Complaint, but is otherwise **DENIED**.

4. As to Count IV of the Amended Complaint for unjust enrichment, PFA is awarded profits, any damages it sustained, and the costs of the action. If Miami Chocolates operated at a loss during the period it competed unfairly, the royalties PFA normally received and the expenditures necessary to establish a new franchise will be elements of the damages award.

5. As to Count V of the Amended Complaint for breach of contract, PFA is awarded $10,275.36.

6. Miami Chocolates is **ENJOINED** from violating Section 19.4 of the Franchise Agreement for a period of two years from the date of this Order. During that period, Miami Chocolates shall not have any interest as a disclosed or beneficial owner in any Competitive Business (as that term is defined in Section 2.1.2 of the Franchise Agreement) located or operating within a twenty-five mile radius of the Shop or any other Peterbrooke chocolatier shop.

7. The Clerk shall **CLOSE** this case. All pending motions are **DENIED** *as moot*.

**DONE** and **ORDERED** in chambers at Miami, Florida, this 28th day of February 2018.

*Marcia G. Cooke*

MARCIA G. COOKE
United States District Judge


Copies furnished to:
*Edwin G. Torres, U.S. Magistrate Judge*
*Counsel of Record*